NOT RECOMMENDED FOR PUBLICATION

File Name: 25a0412n.06

Case No. 24-1211

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

Sep 02, 2025

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| | ) | |
| GREGORY JAMES KNUUTTILA, | ) | O P I N I O N |
| Defendant - Appellant. | ) ) | |

Before: McKEAGUE, MURPHY, and DAVIS, Circuit Judges.

**McKEAGUE, Circuit Judge.** Law enforcement officers in Michigan's Upper Peninsula conducted a years-long investigation into Gregory Knuuttila. The officers suspected that he was trafficking large quantities of methamphetamine; their suspicion was corroborated by several confidential informants and a series of controlled buys. After receiving information about an impending drug run, the officers stopped Knuuttila's car and recovered approximately eight ounces of methamphetamine. Knuuttila ultimately pleaded guilty to possession with intent to distribute a controlled substance, and the district court sentenced him to 324 months in prison.

On appeal, Knuuttila claims that law enforcement officers lacked reasonable suspicion to initiate the traffic stop. He further argues that his sentence was procedurally and substantively unreasonable. Because these arguments fail, we **AFFIRM** the district court's judgment.

# I.

## A.

The Upper Peninsula Substance Enforcement Team (UPSET), a multijurisdictional team combatting drug trafficking in Michigan's Upper Peninsula, began investigating Knuuttila in December 2019. The investigation developed after a series of controlled buys from Coady McMahan, a known methamphetamine dealer. Some of the controlled buys occurred at Knuuttila's house, and law enforcement officers suspected that McMahan and Knuuttila were partners.

In September 2020, multiple informants told the officers that McMahan and Knuuttila would soon travel to Wisconsin or Minnesota to pick up a large quantity of methamphetamine. Using a ping warrant for McMahan's phone, the officers tracked McMahan and Knuuttila's car as it travelled to a Wisconsin casino before turning back toward Michigan. After pulling over the car, the officers recovered seven ounces of methamphetamine. Knuuttila was neither arrested nor charged at that time.

A few months after the traffic stop, McMahan met with the government. McMahan referred to Knuuttila as his partner and explained that Knuuttila was teaching him how to sell drugs. McMahan admitted that he and Knuuttila pooled their money to purchase methamphetamine at the Wisconsin casino, and they planned to split the drugs upon their return.

Law enforcement officers stopped McMahan's car again in July 2021, recovering another 2.75 ounces of methamphetamine. Haley Carlo, the driver of the car, informed the officers that she picked up McMahan at Knuuttila's residence, and they purchased the methamphetamine using Knuuttila's money. McMahan and Carlo bought the methamphetamine from Robb Bergman, a supplier in Wisconsin.

The next month, officers stopped Bergman as he was driving into Michigan and recovered a quarter pound of methamphetamine. Bergman admitted that he supplied Knuuttila with a quarter pound of methamphetamine every few days from June 2021 to August 2021. Shawn Bell and Erik

Sziber, two other dealers in the Upper Peninsula, confirmed that Knuuttila obtained his supply of methamphetamine from Wisconsin, Minnesota, and Illinois.

Multiple informants told law enforcement officers that Knuuttila continued to sell methamphetamine from September 2021 to February 2022. Beginning in February 2022, the officers conducted seven or eight controlled buys from him using three confidential informants.

Joseph Crampton, another methamphetamine dealer, told law enforcement officers that Knuuttila sold a lot of methamphetamine in 2022. At one point, Crampton saw Knuuttila possess a half pound of methamphetamine. Crampton also told the officers that Knuuttila, who kept his belongings in Crampton's basement, possessed three firearms: a Beretta 22, a Smith & Wesson 9-millimeter, and a Smith & Wesson M&P 22.

On July 6, 2022, a confidential informant arranged a "controlled front" with Knuuttila; the informant gave $1,500 to Knuuttila, and Knuuttila agreed to obtain two ounces of methamphetamine on his behalf. Knuuttila texted the informant that his "girl" would go on a drug run the following evening. Law enforcement officers believed that Knuuttila was referring to his girlfriend, Janelle Tadgerson.

On the same day that Knuuttila texted the informant about the drug run, officers stopped Tadgerson's car. Tadgerson admitted that she planned to pick up methamphetamine for Knuuttila the following evening from a supplier in Rhinelander, Wisconsin. The officers did not formally sign up Tadgerson as an informant, but she agreed to refrain from going on any drug runs and inform law enforcement if Knuuttila arranged any trips.

Between July 8 and July 14, law enforcement officers received information from multiple confidential informants about Knuuttila's upcoming drug run. At least one other informant said that Knuuttila would get the methamphetamine from Rhinelander. The informant who fronted the $1,500 to Knuuttila said that a trip was "imminent." On July 9, law enforcement officers pulled over another person who was driving Knuuttila's car. According to law enforcement, this "spooked" Knuuttila and delayed the drug run. The next day, Knuuttila texted the informant who

fronted the $1,500 that "shit [was] all the way fkd up" and he had to "fall back," but he was still "working on it" and "pushing pawns." Suppression Hr'g Ex. 4, R.77-3 at PageID 225.

**B.**

Detective Sergeant Thomas Hyrkas, a member of UPSET and the lead investigator of the case, tracked Knuuttila's phone on July 14 using a ping warrant. As the phone moved toward Wisconsin, Detective Sergeant Hyrkas informed Trooper Andrew Peterson about the drug-trafficking investigation and his belief that Knuuttila was on a drug run.

Knuuttila traveled from the Upper Peninsula to Rhinelander, approximately three hours from where he lived. He remained in Rhinelander for about an hour before travelling back to Michigan. Law enforcement officers observed Knuuttila's car as it returned to the Upper Peninsula; Knuuttila was driving and Tadgerson sat next to him. The car pulled into a casino, and after Knuuttila and Tadgerson spent a short period of time inside, they continued their return trip.

By that point, law enforcement officers planned to stop Knuuttila's car based on their belief that methamphetamine was in the car. However, Trooper Peterson's unit had a policy to "stack" justifications and identify "as many lawful reasons" as possible for the stop. Suppression Hr'g Tr., R.99 at PageID 446. So after Knuuttila and Tadgerson left the casino, Trooper Peterson ran Tadgerson's name through the police database and found that she had outstanding warrants. When Knuuttila and Tadgerson drove within the pickup radius for the warrants, Trooper Peterson and his partner pulled behind Knuuttila and Tadgerson. They then saw Knuuttila and Tadgerson's car go over the fog line on the right side of the road. At that point, the officers initiated a traffic stop.

During the traffic stop, Trooper Peterson asked Knuuttila where he was coming from; Knuuttila falsely claimed that he had only gone to the casino. Trooper Peterson then ran Knuuttila and Tadgerson's names through the law enforcement database and called a drug-sniffing dog to the scene. The dog and handler—who were on standby—arrived approximately 45 seconds later. The dog circled Knuuttila and Tadgerson's car and alerted officers to the presence of a controlled

substance. The officers searched the car and found approximately eight ounces of methamphetamine behind the car's radio.

While executing a search warrant of Crampton's basement—where Knuuttila kept his belongings—law enforcement officers recovered two firearms: a Beretta 22 and a Smith & Wesson 9-millimeter. Tadgerson also admitted that Knuuttila stored a third firearm in her car; during a search of her car, officers found a Smith & Wesson M&P 22. All three firearms matched the description that Crampton provided to law enforcement.

## C.

The government filed a complaint, charging Knuuttila with one count of possession with intent to distribute methamphetamine. The government subsequently filed a ten-count indictment, charging Knuuttila with seven counts of distribution of methamphetamine, one count of possession with intent to distribute methamphetamine, and two counts of being a felon in possession of a firearm. After Knuuttila purportedly violated a court order by attempting to influence the testimony of potential witnesses, the government filed a superseding indictment with several additional charges, including conspiracy, obstruction of justice, and contempt of court.

Knuuttila moved to suppress the evidence obtained from the July 14 traffic stop. He argued that there was no legal basis to initiate the stop because (1) Tadgerson was cooperating with law enforcement, and the officers must have known that she only had "no-pickup warrants"; and (2) crossing the fog line did not justify a stop. The government responded by noting the stop was justified by the officers' reasonable suspicion that Knuuttila and Tadgerson were on a drug run, not just Tadgerson's warrants or the traffic violation. After a two-day suppression hearing, the district court concluded that Detective Sergeant Hyrkas had a reasonable suspicion that Knuuttila was on a drug run, Trooper Peterson acted in objective reliance on the information he received about the drug run, and the scope and duration of the stop were permissible.

Knuuttila then entered a conditional guilty plea to one count of possession with intent to distribute 50 grams or more of methamphetamine. *See* 21 U.S.C. § 841(a)(1), (b)(1)(A). In his plea

agreement, Knuuttila preserved his right to appeal the district court's denial of his motion to suppress.

The probation department submitted its initial presentence investigation report (PSR) in November 2023. According to the initial PSR, Knuuttila's base offense level was 32, as the offense "involved" a total of 8,915.26 kilograms of converted drug weight across four separate occasions between 2020 and 2022.[1] *See* U.S.S.G. § 2D1.1(c)(4). The initial PSR increased Knuuttila's offense level by two levels for possessing a firearm, *see id.* § 2D1.1(b)(1), two levels for directing the use of violence, *see id.* § 2D1.1(b)(2), two levels for maintaining a "stash house," *see id.* § 2D1.1(b)(12), and two levels for obstructing justice, *see id.* § 3C1.1. After subtracting three levels for acceptance of responsibility, Knuuttila's total offense level was 37. With a criminal history category of VI, the Guidelines range was 360 months to life in prison. Knuuttila objected to the initial PSR, arguing that the offense level calculation relied on "[s]elf-serving statements" by confidential informants and other methamphetamine dealers. Def.'s Objs. to Initial PSR, R.106 at PageID 663.

The final PSR included several additions and clarifications. Knuuttila's revised base offense level was 34, based on 12,938.17 kilograms of converted drug weight across six occasions. The PSR maintained the two-point enhancements for possessing a firearm, directing the use of violence, and obstructing justice, but it removed the two-point "stash-house" enhancement. The PSR also removed the three-point reduction for acceptance of responsibility because Knuuttila

---

[1] The converted drug weight is calculated using the Sentencing Guidelines' drug conversion tables. *See* U.S.S.G. § 2D1.1 cmt. n.8(D). According to the drug conversion tables, one gram of methamphetamine equals two kilograms of converted drug weight, and one gram of methamphetamine actual (i.e., "pure" methamphetamine) equals 20 kilograms of converted drug weight. Thus, if a defendant possessed 100 grams of methamphetamine on one occasion and 100 grams of methamphetamine actual on another occasion, the total converted drug weight is 200 kilograms plus 2,000 kilograms. As noted below, however, the district court disagreed with the Sentencing Guidelines' 10:1 ratio between methamphetamine and methamphetamine actual, and it used a 1:1 ratio instead. *See United States v. Saldana*, No. 1:17-CR-271-1, 2018 WL 11690227, at *4 (W.D. Mich. July 3, 2018) (Neff, J.). Using a 1:1 ratio, one gram of methamphetamine and one gram of methamphetamine actual both equal two kilograms of converted drug weight.

(1) attempted to have drugs delivered to him while he was detained, and (2) denied "a great deal of [the] offense conduct and/or relevant conduct in this case." Final PSR, R.109 at PageID 692. Based on a total offense level of 40, the Guidelines range was still 360 months to life in prison.

At the sentencing hearing, Knuuttila maintained his objections to the Guidelines calculations. To support the calculations, the government called two witnesses: Detective Deputy Tyler Harju, an officer from UPSET, and Carter Puuri, a confidential informant who frequently bought methamphetamine from Knuuttila. At the conclusion of their testimony, the district court overruled Knuuttila's objections to the firearms enhancement and the use of violence enhancement. But the court did not understand how the probation department calculated the total drug weight, so it ordered the government to submit a chart explaining "where th[e] numbers came from." Sentencing Hr'g, R.117 at PageID 903–04.

After the government submitted a chart listing each of the six occasions cited by the final PSR, the court held a second sentencing hearing. The court ultimately used five of the six rows in the government's chart, resulting in a total drug weight of 1,145.66 grams of methamphetamine and a base offense level of 30.[2] *See* U.S.S.G. § 2D1.1(c)(5). The court also overruled Knuuttila's objection to the denial of the three-point reduction for acceptance of responsibility. With a total offense level of 36 and a criminal history of VI, the Guidelines range was 324 to 405 months in prison.

After calculating the Guidelines range, the court considered the relevant sentencing factors. *See* 18 U.S.C. § 3553(a). The court described Knuuttila as "a menace to the Upper Peninsula of Michigan," noting that the case involved "a lot of drugs and weapons, lots of people involved, and violence." Sentencing Hr'g, R.128 at PageID 997. The court further acknowledged that Knuuttila's criminal history was "nothing short of atrocious." *Id.* After denying Knuuttila's request for a

---

[2] Because the court used a 1:1 ratio between methamphetamine and methamphetamine mixture, *see supra* n.1, the court did not need to rely on a converted drug weight. *See* U.S.S.G. § 2D1.1(c) n.K.

variance, the court sentenced him to 324 months in prison and 10 years of supervised release. Knuuttila timely appealed.

**II.**

Knuuttila first argues that the district court erroneously denied his motion to suppress the evidence obtained from the July 14 traffic stop. When reviewing the denial of a motion to suppress, this court reviews the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Peake-Wright*, 126 F.4th 432, 436 (6th Cir. 2025) (citing *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019)). The evidence must be viewed in the light most favorable to the government. *Id.* (citing *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009)). This court will affirm the denial of a motion to suppress "if the district court's conclusion can be justified for any reason." *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994).

**A.**

The district court denied Knuuttila's motion to suppress because law enforcement officers "had reasonable suspicion that [Knuuttila] was on a drug run and methamphetamine would be found in the vehicle." Order, R.82 at PageID 246. On appeal, Knuuttila claims that the officers "had no actual details" to support their suspicion. Appellant Br. at 28. We disagree.

A traffic stop is a "seizure" under the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (citation omitted). Nevertheless, law enforcement officers may initiate a traffic stop if they have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). That is, the stop must be "supported by reasonable suspicion of wrongdoing." *United States v. Flores*, 571 F.3d 541, 544 (6th Cir. 2009); *see also United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (explaining that "an officer must have probable cause to make a stop for a civil infraction" but only needs "reasonable suspicion of an ongoing crime to make a stop for a criminal violation").

To establish reasonable suspicion, a law enforcement officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). To be sure, there is no "neat set of legal rules" defining reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation omitted). Rather, the standard is "based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). While a "mere hunch does not create reasonable suspicion," *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (internal quotation marks omitted), the standard is "obviously less" than what is required to establish probable cause, *Navarette*, 572 U.S. at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). When evaluating whether the law enforcement officers' suspicion was reasonable, we must look at the totality of the circumstances. *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir.) (noting that reasonable suspicion is "not a high bar" (citation omitted)), *cert. denied*, 142 S. Ct. 717 (2021). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted).

When law enforcement officers initiated the traffic stop, they had a reasonable suspicion that Knuuttila was transporting a large quantity of methamphetamine. First, Detective Sergeant Hyrkas arranged several controlled buys from Knuuttila in the months before the traffic stop. Second, a confidential informant fronted $1,500 to Knuuttila on July 6, 2022; in exchange, Knuuttila agreed to procure two ounces of methamphetamine. Third, Tadgerson admitted that Knuuttila instructed her to pick up methamphetamine from Rhinelander a few days before the traffic stop. A confidential informant corroborated her claim that Knuuttila would get the methamphetamine from Rhinelander. Fourth, between July 8 and July 14, the confidential informant who fronted the $1,500 to Knuuttila told law enforcement officers that the trip to obtain the methamphetamine was "imminent." Suppression Hr'g Tr., R.98 at PageID 326. Knuuttila's

text messages with the informant confirmed that Knuuttila was "working on it." Suppression Hr'g Ex. 4, R.77-3 at PageID 225. Fifth, the officers tracked Knuuttila's phone on July 14—the day of the traffic stop—as he drove almost three hours from the Upper Peninsula to Rhinelander, remained in Rhinelander for only an hour, and then returned to the Upper Peninsula. Detective Sergeant Hyrkas testified that, based on his training and experience, such a short stay in Rhinelander after a relatively lengthy trip was consistent with a drug transaction, and the details of the trip matched the information provided by the confidential informants. Sixth, law enforcement officers identified Tadgerson as the sole passenger in Knuuttila's car upon its return from Rhinelander. Based on this observation, Detective Sergeant Hyrkas deduced that Tadgerson had disobeyed his instructions and accompanied Knuuttila on the drug run.

After Knuuttila's phone moved toward Rhinelander, Detective Sergeant Hyrkas informed Trooper Peterson about the controlled buys, the controlled front, Knuuttila's likely destination, the expected supplier, the expected quantity of methamphetamine, and the fact that Knuuttila may be armed. The inferences drawn from the aforementioned facts allowed Detective Sergeant Hyrkas to establish "a moderate chance of finding evidence of wrongdoing," so Trooper Peterson could stop Knuuttila's car for further investigation. *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (citation omitted); *see also Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019) (recognizing that an officer may initiate a stop "based on information obtained from fellow officers," even if "the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for a stop" (citations omitted)).

**B.**

Knuuttila does not meaningfully respond to the evidence that he was returning from a drug run prior to the traffic stop. Instead, he repeatedly attacks the officers' two other reasons for stopping his car: Tadgerson had outstanding warrants, and the car crossed the fog line. In his view, those justifications were insufficient, so "nothing legitimate justified the traffic stop." Appellant Br. at 30.

Again, this argument ignores the third—and most important—reason why the officers initiated the stop. The officers who testified at the suppression hearing repeatedly stated that they planned to stop Knuuttila's car *solely* because of their reasonable suspicion that he was on a drug run. *See* Suppression Hr'g Tr., R.98 at PageID 329–30 ("We were going to conduct a traffic stop of Mr. Knuuttila to try to recover the methamphetamine that we believed to be inside that car on his return trip."); *id.* at PageID 330 (noting that even if Knuuttila did not commit a traffic infraction, the officers "were going to conduct a traffic stop" because they "had probable cause to search that car for methamphetamine"); *id.* at PageID 332 ("We were doing a traffic stop regardless of whether Ms. Tadgerson was in the vehicle."); Suppression Hr'g Tr., R.99 at PageID 431 (noting that Knuuttila would be arrested "[r]egardless of the circumstances"); *id.* at PageID 446 ("Our plan was to no matter what we were going to stop the car because we believe we at the very least had reasonable suspicion that crime was afoot, but our goal was, of course, to have as many lawful reasons."); *id.* at PageID 475 ("[W]e believed that he was transporting narcotics. The decision was made that we were going to stop this vehicle regardless of any infraction.").

Knuuttila questions the credibility of this testimony for two reasons; neither are convincing. First, he notes that the officers "did not share their reasons [justifying the stop] *anywhere*" until he filed a motion to suppress. Reply Br. at 5. Not so. The affidavit accompanying the complaint—filed nine months before Knuuttila's motion to suppress—specifically cited all three reasons for stopping Knuuttila's car: Knuuttila had "likely" just obtained a large quantity of methamphetamine, Tadgerson had outstanding warrants, and the car crossed the fog line. Compl. Aff., R.1-1 at PageID 3.

Second, Knuuttila claims that if the officers stopped Knuuttila because they believed he was on a drug run, then Trooper Peterson would have acknowledged as much in his police report. But Trooper Peterson explained why he did not include specific information about the drug-trafficking investigation in his report: he wanted to "protect the integrity of the case and confidential informants." Suppression Hr'g Tr., R.99 at PageID 436. That is, he did not want to

immediately reveal detailed information about another law enforcement agency's investigation. Nevertheless, Trooper Peterson testified that he initiated the stop based on the information that he received from Detective Sergeant Hyrkas. Because the officers had a reasonable suspicion of ongoing criminal activity, the traffic stop was constitutionally valid, and we need not consider the officers' supplemental justifications. *See United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc) (recognizing that a stop does not violate the Fourth Amendment if the officer had a sufficient basis to initiate the stop "regardless of whether [it] was the only basis or merely one basis for the stop").

## C.

Knuuttila also claims that the officers unreasonably prolonged the traffic stop to allow for a drug-sniffing dog to circle his car.

The length of a traffic stop "may stretch as long as the officer reasonably needs to complete the mission for which it began." *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023) (internal quotation marks omitted). But if the officers extend a seizure "beyond the time reasonably required to complete that mission," then it may "become unlawful." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). When law enforcement officers have a reasonable suspicion that a vehicle contains contraband, we have routinely found that officers may continue a traffic stop while awaiting the arrival of a drug-sniffing dog. *See Sheckles*, 996 F.3d at 345 (48-minute delay); *United States v. Perez*, 440 F.3d 363, 373 (6th Cir. 2006) (one hour); *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (30 to 45 minutes); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (35 minutes).

Like the district court, we conclude that the duration of the stop was reasonable in light of the officers' "mission" to confirm or dispel their suspicion that Knuuttila was on a drug run. *Williams*, 68 F.4th at 307. Trooper Peterson approached Knuuttila's car at approximately 8:52 p.m. He then asked Knuuttila to exit the vehicle, and Knuuttila consented to a pat down for weapons. After asking "standard" questions about Knuuttila's travel plans, Trooper Peterson returned to his

patrol car at 8:55 p.m. While in the patrol car, he ran Knuuttila and Tadgerson's names through the police database, per standard practice. He called the pre-arranged canine handler at 8:56 p.m., and the handler arrived with a drug-sniffing dog approximately 45 seconds later. After circling the vehicle, the dog alerted to the presence of narcotics at 9:02 p.m. At that point, the officers had probable cause to search the vehicle. *See United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012). Because the dog alerted approximately 10 minutes after Trooper Peterson first approached Knuuttila's car, the duration of the stop was reasonable.

**III.**

Knuuttila next argues that his 324-month sentence was procedurally unreasonable. A sentence is procedurally unreasonable if the district court improperly calculates the Guidelines range. *See United States v. Golson*, 95 F.4th 456, 461 (6th Cir. 2024). Because Knuuttila preserved the procedural arguments he raises on appeal, we review his claims for an abuse of discretion. *United States v. Betro*, 115 F.4th 429, 454 (6th Cir. 2024) (citation omitted). In doing so, we review the court's legal conclusions de novo and its factual findings for clear error. *United States v. Nunley*, 29 F.4th 824, 830 (6th Cir. 2022). A factual finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018) (citation omitted).

On appeal, Knuuttila raises five separate challenges to how the district court calculated his total offense level under the Guidelines: (1) the court used "unreliable allegations" to calculate the total drug weight that set his base offense level; (2) the court erroneously provided the government a "second chance" to prove a "higher drug quantity" by holding a second sentencing hearing; (3) there was no "credible, reliable" evidence supporting the two-level firearms enhancement; (4) the testimony supporting the two-point use of violence enhancement was "non-specific" and

"less than convincing"; and (5) the court should not have relied on pre-plea behavior when denying Knuuttila credit for acceptance of responsibility. None of these claims are persuasive.

**A.**

Knuuttila first claims that the evidence supporting the total drug weight calculation "constituted little more than conjecture[] and self-serving statements from drug traffickers and users with every incentive to try to curry favor with law enforcement and shift blame to others[.]" Appellant Br. at 35.

When a defendant is convicted of a drug crime, "the base offense level at sentencing depends upon the amount of drugs involved in the offense." *United States v. McReynolds*, 964 F.3d 555, 562 (6th Cir. 2020) (citation omitted); U.S.S.G. § 2D1.1(a)(5), (c). The quantity of drugs "involved" in the offense is not limited to the crime of conviction. *See* U.S.S.G. § 2D1.1 cmt. n.5 (citing U.S.S.G. § 1B1.3(a)(2)). Rather, the total drug weight is based on the defendant's "relevant conduct." *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003). Under the Guidelines, "relevant conduct" includes "acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see also United States v. Benton*, 957 F.3d 696, 701 (6th Cir. 2020) (explaining that "same course of conduct" and "common scheme or plan" are distinct theories of relevant conduct).

If the district court cannot determine the exact quantity of drugs, it may "make a reasonable estimate based on physical evidence or testimony." *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020). However, any estimate must be supported by a preponderance of the evidence. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (citation omitted). The evidence must also have a "minimal level of reliability above mere allegation." *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004) (citation omitted). If the government's evidence is based on hearsay statements or co-conspirator testimony, corroboration can provide sufficient "indicia of reliability." *United States v. Al-Cholan*, 610 F.3d 945, 955 (6th Cir. 2010) (citation omitted) (hearsay statements); *United States v. Fitzgerald*, 754 F. App'x 351, 367–68 (6th Cir. 2018) (co-

conspirator testimony); *see also United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019) ("The indicia-of-reliability standard is a relatively low hurdle." (internal quotation marks omitted)). When choosing between "plausible estimates of drug quantity," the court should "err on the side of caution." *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990). We review the district court's factual findings on the quantity of drugs attributable to a defendant for clear error. *Tisdale*, 980 F.3d at 1096; *United States v. Rios*, 830 F.3d 403, 436 (6th Cir. 2016) (citation omitted).

At the district court's request, the government submitted a table listing six occasions on which Knuuttila possessed or sold methamphetamine. *See* Govt. Sentencing Supp., R.118 at PageID 912. Knuuttila argued that the court should only count the fourth row, referring to the 207.80 grams of methamphetamine recovered from the July 2022 traffic stop.[3] The court ultimately used the first five rows of the table, resulting in a total drug weight of 1,145.66 grams of methamphetamine. We discuss each of the four contested rows in turn.

**1.**

The first row refers to 193.77 grams of methamphetamine that law enforcement officers recovered during the September 2020 traffic stop, about two years before Knuuttila's arrest. Knuuttila argues that (1) his connection to the methamphetamine is based on statements by "a flock of drug offenders looking to make deals with the government," and (2) if he was actually connected to the methamphetamine in the car, then the officers would have arrested him at that time. Appellant Br. at 37.

The district court did not clearly err by including this row in its calculation. The traffic stop occurred near Wisconsin as Knuuttila and McMahan, his partner, returned from a drug run. Knuuttila and McMahan were both in the car—which was registered to Knuuttila's wife—when

---

[3] To align with the district court's total drug weight calculation, we refer only to the weight of methamphetamine, not the converted drug weight, for the remainder of this section. *See supra* n.2.

the officers found seven ounces of methamphetamine. In a subsequent interview, McMahan admitted that he and Knuuttila purchased the methamphetamine and planned to split it upon their return.

Puuri, the confidential informant who testified at Knuuttila's sentencing hearing, corroborated McMahan's account. He testified that in 2021, Knuuttila refused to go on drug runs because he had recently been pulled over while traveling with McMahan to pick up methamphetamine in Wisconsin. The district court found Puuri to be credible. *See United States v. Mosley*, 53 F.4th 947, 962 (6th Cir. 2022) (noting that "we afford great weight to the district court's credibility determinations" when the court relies on co-conspirator testimony). Because McMahan and Puuri's statements align with each other and the officers' observations during the traffic stop, the district court did not clearly err by relying on them when calculating the total drug weight. *See United States v. Santana*, 723 F. App'x 331, 340 (6th Cir. 2018) (noting that statements by cooperating witnesses can be sufficiently reliable when they are independent, made "some relatively lengthy amount of time apart," corroborate each other in "at least some relevant details," and match "corroborative circumstantial evidence").

**2.**

The second row refers to 177.10 grams of methamphetamine, based on statements that Shawn Bell—another methamphetamine dealer in the Upper Peninsula—made to law enforcement officers in April and May 2021. This amount is the sum of three subtotals: (1) 56.699 grams (i.e., two ounces), based on Bell's admission that he supplied Knuuttila with two ounces of methamphetamine per week starting in late 2020; (2) 113.398 grams (i.e., four ounces), based on Bell's description of two specific instances in which Knuuttila received two ounces of methamphetamine from another supplier; and (3) 7.0 grams, based on Bell's statement that

Knuuttila sold him two "balls" of methamphetamine in July or August 2020.[4] Knuuttila claims that "nothing substantive" linked him to these drugs. Appellant Br. at 43.

Here too, the court did not clearly err by including this amount in its total drug weight calculation. To be sure, the government did not provide evidence corroborating Bell's statements about the specific quantities of methamphetamine attributed to Knuuttila. But it did not need to, as "[p]articular corroboration for each claim is not required." *Armstrong*, 920 F.3d at 399 (acknowledging that claims by an unidentified informant can satisfy the "indicia-of-reliability standard" if the court "can reasonably corroborate enough of the information to make a general finding about the informant's reliability"). Instead, the court found that Bell's statements were corroborated by "a course of conduct" suggesting that Knuuttila was "involved in the exchange of and sale of methamphetamine" during the times that Bell described. Sentencing Hr'g, R.128 at PageID 964–65. Additionally, Bell stated that Knuuttila became upset after Bell sold methamphetamine to one of Knuuttila's customers. This statement is corroborated by both the buyer himself, who admitted that he purchased methamphetamine from Knuuttila in the summer of 2020, and Detective Deputy Harju, who testified that the buyer conducted a series of controlled buys from Knuuttila.

Moreover, the subtotals used by the district court were conservative estimates. While Bell admitted that he sold two ounces of methamphetamine to Knuuttila on a weekly basis, the court only counted one week. Bell further stated that Knuuttila received two to four ounces of methamphetamine from another supplier every week for several months, but the court only counted four ounces in total. Because the court found sufficient corroboration and likely "err[ed]

---

[4] A "ball" or "eight ball" refers to 3.5 grams of methamphetamine.

on the side of caution," we see no clear error. *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008).[5]

**3.**

The third row refers to 453.59 grams of methamphetamine, based on statements that Crampton—Knuuttila's drug-trafficking partner—made during an interview with law enforcement officers in June 2022.[6] This amount is the sum of two subtotals: (1) 226.796 grams (i.e., a half pound), based on Crampton's statement that he personally saw Knuuttila possess a half pound of methamphetamine about two weeks before the interview; and (2) 226.796 grams (i.e., a half pound), based on Crampton's personal knowledge that Knuuttila sold between a half pound and a pound of methamphetamine every one to two weeks.

Again, the district court did not clearly err by including this amount in its calculation. The court found that the evidence corroborating Crampton's statements was "quite strong." Sentencing Hr'g, R.128 at PageID 966; *see also United States v. Hunt*, 487 F.3d 347, 353 (6th Cir. 2007) (holding that the district court did not clearly err by relying on statements by co-conspirators because the statements were corroborated by both each other and circumstantial evidence). First, Crampton told law enforcement officers that Knuuttila's supply of methamphetamine came from Minnesota and Wisconsin. This statement was corroborated by McMahan, Bell, Tadgerson, and Puuri. Second, Crampton explained that he let Knuuttila store his belongings in Crampton's basement. This statement was corroborated by both Detective Deputy Harju, who found what appeared to be Knuuttila's belongings in Crampton's basement, and Knuuttila himself, who

---

[5] Even if the district court clearly erred by including this row in its total drug weight calculation, that error would be harmless. *See United States v. Fletcher*, 295 F. App'x 749, 755 (6th Cir. 2008) (noting that erroneously including a drug quantity in a total drug weight calculation is harmless if the remaining total drug weight results in the same base offense level). If the court excluded the second row from its calculation, then the total drug weight would be 968.56 grams of methamphetamine, which still yields a base offense level of 30. *See* U.S.S.G. § 2D1.1(c)(5).

[6] Crampton died in December 2022, prior to Knuuttila's sentencing hearing.

admitted on a recorded jail call that everything in the basement belonged to him. Third, Crampton stated that Knuuttila sold methamphetamine out of Crampton's house; this is corroborated by multiple controlled buys. So while Knuuttila correctly notes that the court relied on hearsay, Crampton's statements were sufficiently corroborated by independent statements and direct observations by law enforcement. *See Hunt*, 487 F.3d at 353. Thus, the court did not clearly err.

**4.**

The fifth row refers to 113.40 grams of methamphetamine, based on Puuri's statements to law enforcement officers in November 2022 and his testimony at Knuuttila's sentencing hearing. This amount equals a quarter pound, the total amount of methamphetamine that Puuri received from Knuuttila.

As the district court recognized, this was an underestimate. *See* Sentencing Hr'g, R.128 at PageID 966–67 ("[T]he testimony was for a lot more quantity than was attributed, which was the pattern throughout by the probation officer who drafted the [final PSR]."). Puuri testified that, when he first met Knuuttila in 2021, he bought 3.5 grams of methamphetamine "[j]ust about every day." Sentencing Hr'g, R.117 at PageID 864. Soon after that, Puuri bought 7 grams from Knuuttila every day for a few months. Eventually, Puuri would buy a quarter ounce, a half ounce, or even a full ounce at a time. Puuri testified that he continued to purchase methamphetamine from Knuuttila until the July 2022 traffic stop.

The court concluded that Puuri was credible, and "[w]e afford the district court's credibility determinations regarding witness testimony great deference and must uphold its findings of fact unless they are clearly erroneous." *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007). Because we see no clear error, the district court permissibly included this amount in its total drug weight calculation.

**\*\*\***

The district court did not clearly err by attributing the drug weights listed in the first five rows of the government's chart to Knuuttila. *See United States v. Estrada-Gonzalez*, 32 F.4th 607,

614 (6th Cir. 2022) (explaining the district court's factual findings are not clearly erroneous if they are "plausible on the record as a whole"). Moreover, there was considerable evidence that all five amounts were part of a common scheme or plan. *See* U.S.S.G. § 1B1.3 cmt. n.5(B)(i) (providing that multiple offenses are part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*"). All five instances are directly related to Knuuttila's years-long scheme of purchasing large quantities of methamphetamine from Wisconsin or Minnesota, transporting it to the same region in the Upper Peninsula, and selling it to the local community. *See Benton*, 957 F.3d at 702–03 (concluding that two instances of selling drugs shared a common purpose because the defendant "sold drugs for a living"); *United States v. McCloud*, 935 F.3d 527, 532 (6th Cir. 2019) (recognizing that "distribut[ing] drugs" can be a common purpose). Thus, we see no reason to disturb the district court's conclusion that the total drug weight based on Knuuttila's "relevant conduct" was 1,145.66 grams, resulting in a base offense level of 30. *See* U.S.S.G. § 2D1.1(a)(5), (c)(5).

**B.**

Knuuttila raises "[a]nother problem" with the district court's total drug weight calculation: he claims the court erred by "basically let[ting] the government have a second chance to try to prove the higher drug quantity when the government initially failed to do so." Appellant Br. at 47.

At the end of the first sentencing hearing, the court stated that it did not "understand the government's argument" regarding the total drug weight attributable to Knuuttila. Sentencing Hr'g, R.117 at PageID 903. The court requested "an explanation of where those numbers arose" so that it could determine Knuuttila's base offense level. *Id.* at PageID 904. Knuuttila objected to the court's request, but the court replied that it had "a greater obligation to get it right." *Id.* at PageID 905. The government then submitted the six-row table described above, which cites only the final PSR and the evidence presented at the first sentencing hearing. At the second sentencing hearing, the parties did not call any witnesses or present any additional evidence. Instead, the court

addressed each of the six rows in the government's table, calculated the total drug weight, and set Knuuttila's base offense level.

The court did not abuse its discretion by requesting the chart and holding a second hearing. When a complex or fact-laden issue arises during a sentencing hearing, district courts frequently request supplemental briefing from the parties before ruling on the issue. *See, e.g.*, *United States v. French*, 976 F.3d 744, 747 (6th Cir. 2020) (deferring a ruling on a sentencing enhancement and ordering briefing from the parties); *United States v. Presley*, 547 F.3d 625, 628 (6th Cir. 2008) (instructing the government to file a supplemental memorandum after "expressing concern" about a sentencing disparity); *United States v. McGahee*, 257 F.3d 520, 532–33 (6th Cir. 2001) (postponing sentencing "to allow the parties to develop additional proof" relating to whether certain evidence should be considered at sentencing). Here, the district court repeatedly expressed its confusion about how the final PSR calculated the total drug weight. *See* Sentencing Hr'g, R.117 at PageID 903 ("[M]aybe I didn't read the prehearing report more closely."); *id.* at PageID 904 ("I just don't really think I can rule on that issue. . . . I don't know. I really don't."). So, after acknowledging its "duty to get it right," the court allowed the government to provide a "linear presentation" of the evidence that was already in the record. *Id.* at PageID 904–05.

In response, Knuuttila cites two cases which recognize that at sentencing, the government is not entitled to "a second bite at the apple." *United States v. Dickler*, 64 F.3d 818, 832 (3d Cir. 1995) (citation omitted); *United States v. Histed*, 93 F.4th 948, 957 (6th Cir.), *cert. denied*, 144 S. Ct. 2618 (2024). But those cases are inapposite, as they provide that the government ordinarily may not present *additional* evidence on *remand*. By contrast, this case was before the district court in the first instance, and the government did not attempt to "present additional evidence" at the second hearing. *Histed*, 93 F.4th at 957. In short, nothing about the procedure that the district court used to calculate Knuuttila's base offense level was improper.

**C.**

Pursuant to the final PSR's recommendation, the district court applied a two-point sentencing enhancement because Knuuttila possessed a firearm. Knuuttila argues that the evidence supporting this enhancement was "scant" and consisted of witnesses who had "motivation to lie." Appellant Br. at 49, 51.

The firearm enhancement applies "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). The government must show, by a preponderance of the evidence, that "(1) the defendant actually or constructively possessed the dangerous weapon (2) during the offense." *Mosley*, 53 F.4th at 966. If the government makes that showing, "the burden shifts to the defendant to show that it was clearly improbable that the weapon was connected to the offense." *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (internal quotation marks omitted). The district court's conclusion that the defendant possessed a firearm is reviewed for clear error. *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008).[7]

The district court did not clearly err by finding that Knuuttila possessed a firearm. To reach that conclusion, the court relied on testimony from Puuri and Detective Deputy Harju at the sentencing hearing. Puuri testified that he saw Knuuttila possess firearms "a couple times." Sentencing Hr'g, R.117 at PageID 872. According to the final PSR, at least four independent witnesses corroborated this claim. Detective Deputy Harju then testified that, according to Crampton, Knuuttila had three handguns: a Beretta 22, a Smith & Wesson 9-millimeter, and a Smith & Wesson M&P 22.

---

[7] Knuuttila does not contest that, assuming he possessed a firearm, the possession was "during the offense." *Mosley*, 53 F.4th at 966; *see also United States v. West*, 962 F.3d 183, 187–88 (6th Cir. 2020) (noting that "during the commission of the drug offense" refers to possession during "relevant conduct" as defined by U.S.S.G. § 1B1.3). Thus, he waived any argument relating to that element of the enhancement. *See Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013) ("[A]rguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

There is evidence that Knuuttila possessed all three firearms. First, the officers recovered a Beretta 22 and a Smith & Wesson 9-millimeter during the search of Crampton's basement. The officers found the handguns near a photo album that included several photographs of Knuuttila and his ex-girlfriend. In a recorded jail call, Knuuttila stated that "everything" in Crampton's basement was his. Second, the officers recovered a Smith & Wesson M&P 22 during the search of Tadgerson's car. Tadgerson admitted that the firearm belonged to Knuuttila. Puuri testified that he saw Knuuttila possess both the handgun in Tadgerson's car and one of the handguns in Crampton's basement.

According to the district court, the testimony did not "leave[] any question" that Knuuttila possessed firearms while he was trafficking methamphetamine. *Id.* at PageID 898. And Knuuttila offers no evidence suggesting that it was "clearly improbable" that the firearms were connected to his drug-trafficking activity. *Catalan*, 499 F.3d at 606 (citation omitted). Thus, the district court did not err by applying the § 2D1.1(b)(1) enhancement.

**D.**

Knuuttila also objects to the two-point enhancement for directing the use of violence. The district court applied the enhancement based on Puuri's testimony that Knuuttila told him to "slap" people who owed money to Knuuttila. Sentencing Hr'g, R.117 at PageID 871. On appeal, Knuuttila reasserts his argument that Puuri's testimony was "self-serving, non-specific, and less than convincing." Appellant Br. at 54.

The use-of-violence enhancement applies "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence." U.S.S.G. § 2D1.1(b)(2). At the sentencing hearing, Puuri testified that people sometimes owed money to Knuuttila; if Knuuttila "wanted something to be done about it," he would tell Puuri to "handle it." Sentencing Hr'g, R.117 at PageID 871. Specifically, Puuri explained that Knuuttila occasionally told him to "slap somebody that owed [Knuuttila] money." *Id.* Puuri's testimony was consistent with his prior interviews with law enforcement officers.

23

Again, the court did not clearly err by relying on Puuri's statements. While there is no evidence corroborating this specific testimony, the district court found Puuri to be credible, and several other aspects of his testimony were corroborated by witness statements and extrinsic evidence. Because we afford "great weight" to the court's credibility determination, we decline to second-guess the court's conclusion that the enhancement applies. *Mosley*, 53 F.4th at 962; *see also Esteppe*, 483 F.3d at 452.

**E.**

Knuuttila's last procedural reasonableness challenge relates to the district court's denial of a reduction of his offense level for acceptance of responsibility. *See* U.S.S.G. § 3E1.1.

Before pleading guilty, Knuuttila purportedly attempted to influence the testimony of potential witnesses, including Tadgerson and Crampton. Notwithstanding this conduct, the initial PSR recommended that Knuuttila receive a three-point reduction for acceptance of responsibility, as Knuuttila's attempts to obstruct justice were "mostly futile" and "occurred prior to his plea." Initial PSR, R.104 at PageID 622. The government did not object to the three-point reduction. However, the final PSR withdrew the prior recommendation, stating that the three-point reduction was "no longer appropriate" for two reasons: (1) the probation department received a report that in January 2023, Knuuttila attempted to have drugs delivered to him in jail, and (2) Knuuttila denied a "great deal" of the offense conduct, which is "inconsistent with acceptance of responsibility." Final PSR, R.109 at PageID 692.

At the second sentencing hearing, Knuuttila noted that the alleged conduct—attempting to influence witness testimony and possess drugs in jail—occurred before he pleaded guilty. The government responded by noting that in January 2024—after Knuuttila pleaded guilty—he and four other inmates prepared "a laundry bag containing two AAA batteries, toilet paper, and a small piece of paper" that tested positive for a synthetic cannabinoid. Sentencing Hr'g, R.128 at PageID 986. After hearing the parties' arguments, the court concluded that the post-plea "distribution scheme" was enough to deny Knuuttila the acceptance of responsibility reduction, but it also would

have denied the reduction because of his "more egregious" attempts to obstruct justice. *Id.* at PageID 987. On appeal, Knuuttila claims that (1) he was improperly denied the reduction because he raised "legal objections" to the initial PSR, and (2) the court erroneously relied on conduct that occurred before he pleaded guilty. Appellant Br. at 59 (emphasis omitted).

The Guidelines provide for a two-level decrease to a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "The defendant bears the burden of showing that he has accepted responsibility." *United States v. Paulette*, 457 F.3d 601, 608 (6th Cir. 2006) (citation omitted). Moreover, "a defendant found to have obstructed justice (as is the case here) will receive an acceptance-of-responsibility credit only in 'extraordinary cases.'" *Histed*, 93 F.4th at 961 (quoting U.S.S.G. § 3E1.1 cmt. n.4). We review the district court's denial of the reduction for clear error. *United States v. Merritt*, 102 F.4th 375, 381 (6th Cir. 2024).

Knuuttila's first argument—that his "legal objections" prompted the denial of the reduction—is meritless. To be sure, the PSR explained that the reduction was not warranted because Knuuttila "denied a great deal of [the] offense conduct and/or relevant conduct in this case." Final PSR, R.109 at PageID 692. But in denying the reduction, the court never referred to Knuuttila's "legal objections" to the Guidelines calculations. Instead, it only addressed Knuuttila's obstruction of justice and his drug activity while in jail. Knuuttila's argument is grounded in speculation, not in the record.

Knuuttila's second argument—that the court "inappropriately" denied the reduction based on "pre-plea allegations"—also fails. Appellant Br. at 59. In evaluating whether the acceptance of responsibility reduction is warranted, courts routinely consider the defendant's post-indictment, pre-plea conduct. *See, e.g.*, *Merritt*, 102 F.4th at 382 (noting that the defendant failed to comply with his bond conditions and fled from the police); *United States v. Anderson*, No. 23-1127, 2024 WL 209225, at *1, *3 (6th Cir. Jan. 19, 2024) (explaining that before the defendant pleaded guilty, he absconded for 14 months); *United States v. Zerpa-Ruiz*, 784 F. App'x 353, 356–57 (6th Cir.

2019) (acknowledging that the defendant "engaged in obstructive conduct *after* his indictment" but before he pleaded guilty).

Here, the court offered two independent reasons for denying the reduction. First, Knuuttila obstructed justice by attempting to influence witness testimony before he pleaded guilty. *See* Sentencing Hr'g, R.128 at PageID 986 (noting that the court would deny the reduction based on "the instances where he was using the phone" while in jail). Clearly, this conduct is inconsistent with an acceptance of responsibility. *See United States v. Kamper*, 748 F.3d 728, 745 (6th Cir. 2014) ("Witness intimidation ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." (internal quotation marks omitted)). Second, he was involved in a drug "distribution scheme at the jail *after* his plea." Sentencing Hr'g, R.128 at PageID 987 (emphasis added). This too suggests a failure to accept responsibility. *See United States v. Cadieux*, 846 F. App'x 389, 394 (6th Cir. 2021) ("[P]ersisting in related criminal conduct is inconsistent with the § 3E1.1 reduction." (internal quotation marks omitted)). Because neither rationale was clearly erroneous, the court did not procedurally err by denying the acceptance of responsibility reduction.

## IV.

Finally, Knuuttila challenges the substantive reasonableness of his 324-month sentence. In Knuuttila's view, the court's sentence "rests too heavily" on the Guidelines and ignored his age, upbringing, and potential for rehabilitation. Appellant Br. at 60.

A sentence is substantively unreasonable if it is "too long." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). More specifically, the sentence must be "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of [18 U.S.C.] § 3553(a)." *United States v. Gates*, 48 F.4th 463, 476–77 (6th Cir. 2022) (quoting *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (order)). As that description suggests, substantive reasonableness is "a matter of reasoned discretion, not math." *Rayyan*, 885 F.3d at 442.

We review the substantive reasonableness of the sentence for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). The court declined to use the drug ratios provided by the Guidelines, *see supra* n.1, so the court's sentence was below the properly calculated Guidelines range. Because the sentence was below the Guidelines range, we presume that it is substantively reasonable when considering Knuuttila's challenge. *See United States v. Lynde*, 926 F.3d 275, 279 (6th Cir. 2019). To rebut this presumption, Knuuttila must show that the court "chose a sentence arbitrarily, ignored pertinent § 3353(a) factors, or gave unreasonable weight to any single factor." *United States v. Gardner*, 32 F.4th 504, 530 (6th Cir.), *cert. denied*, 143 S. Ct. 251 (2022).

Knuuttila's below-Guidelines sentence was substantively reasonable. The court first acknowledged that § 3553(a) provides an "outline" of what the court must consider when imposing a sentence. Sentencing Hr'g, R.128 at PageID 997. Beginning with the nature of the offense, the court described Knuuttila as "a menace to the Upper Peninsula of Michigan," referring to "a whole series of acts over a long period of time." *Id.* When discussing Knuuttila's history and characteristics, the court explicitly considered his argument that, at his age, "a lengthy sentence may be a life sentence." *Id.* at PageID 998–99. It also acknowledged his "difficult youth" and the possibility that he may "move away from criminal behavior" as he ages. *Id.* But the court ultimately concluded that his criminal history was "nothing short of atrocious" and that it was "impossible . . . to overlook the nature and extent of [Knuuttila's] criminal history." *Id.* at PageID 997–98. The court also recognized the need to promote respect for the law, but it "wonder[ed] whether Mr. Knuuttila isn't past that point." *Id.* at PageID 998. After concluding its "independent review of the sentencing factors," the court declined Knuuttila's request for a variance and imposed a 324-month sentence. *Id.* at PageID 998–99.[8]

---

[8] Knuuttila cites a Fifth Circuit case in which the defendant, who pleaded guilty to possession with intent to distribute methamphetamine within 1,000 feet of a playground, was sentenced to 168 months in prison. *See United States v. Vittek*, 228 F. App'x 469, 473–74 (5th Cir. 2007) (per curiam). Knuuttila claims that his 324-month sentence "far outstrips" the sentence of this "comparable defendant[.]" Appellant Br. at

Ultimately, Knuuttila "does not identify any argument that he raised and the district court failed to address." *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006). Instead, he "asks us to balance the factors *dif*[*f*]*erently* than the district court did." *Id.* But the district court was "in a superior position to find facts and judge their import under § 3553(a)," and we see no reason to disturb its judgment. *United States v. Xu*, 114 F.4th 829, 846 (6th Cir. 2024) (quoting *United States v. Mayberry*, 540 F.3d 506, 519 (6th Cir. 2008)).

## V.

We **AFFIRM** the district court's judgment.

---

60. This argument fails for at least two reasons. First, a defendant's argument that a sentence creates unwarranted disparities is "an unconventional ground for challenging a [*below*]-*guidelines* sentence." *United States v. Swafford*, 639 F.3d 265, 270 (6th Cir. 2011). Second, *Vittek* is not a comparable case. *See* 18 U.S.C. § 3553(a)(6) (providing that the court must consider the need to avoid sentencing disparities "among defendants *with similar records*" (emphasis added)). The defendant in *Vittek* had a criminal history category of II; Knuuttila had a criminal history category of VI. *Vittek*, 228 F. App'x at 474; Final PSR, R.109 at PageID 711.